UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KRISTIN CRABTREE,            )
                            )
Plaintiff,                    )
                            )
v.                            )
                            )        Case No. 1:12-CV-171-JAR-SPM
                            )
                            )
CAROLYN W.  COLVIN,[1]         )
Acting Commissioner of Social Security,    )
                            )
Defendant.                    )

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Kristin Crabtree for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  This matter was referred

to the undersigned United States Magistrate Judge for review and a recommended disposition

pursuant to 28 U.S.C. § 636(b).  The undersigned recommends that the decision of the

Commissioner be affirmed.

## I.  PROCEDURAL HISTORY

On August 21, 2009, Plaintiff applied for SSI, alleging that she had been unable to work

since January 19, 2006, due to mental, emotional, and physical disorders.  (Tr. 108-11, 139).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

That application was initially denied. (Tr. 44). On December 23, 2009, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 51). A hearing was held before an ALJ on March 15, 2011. (Tr. 24-43). On May 18, 2011, the ALJ issued an unfavorable decision. (Tr. 7-23). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council, but the Council declined to review the case on August 9, 2012. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

### A. PLAINTIFF'S TESTIMONY BEFORE THE ALJ

Plaintiff was born October 6, 1980. (Tr. 44). Plaintiff appeared and testified at a hearing before the ALJ on March 15, 2011, without counsel. (Tr. 29-43). She has completed a year of vocational college. (Tr. 29-30). She lives with her ex-husband and five children, whose ages ranged from five to fourteen (Tr. 30). At home, she folds laundry and helps cook dinner, but her ex-husband does most of the cleaning. (Tr. 32). There are six steps to get up to her home, and she only has trouble getting up and down them when they are slick. (Tr. 31). She can drive a car for short distances; however, because of a pinched spinal nerve, she does not do well driving with pedals for too long. (Tr. 32). Plaintiff admitted to narcotic dependence and said she used marijuana "when [she] was younger." (Tr. 31).

Plaintiff testified that she has several physical disorders. (Tr. 32-33). She has degenerative disc disease that causes pain in her lower back that goes down her left leg; it is there all the time. (Tr. 33-34). It is treated with epidural injections and medication. (Tr. 34). She testified that she has seen surgery consultants for her back but has not opted to have surgery yet. (Tr. 33). Plaintiff also has fibromyalgia, which causes pain, weakness, and fatigue; she

takes Cymbalta for it. Plaintiff has hepatitis C that had "just recently been diagnosed," and she thinks it is making her feel run down and lethargic. (Tr. 37). Plaintiff has a blood clotting disorder that makes her have to take a high dosage of aspirin every day. Plaintiff also has rheumatic fever that causes pain and swelling when she has a fever; this occurs frequently because of her hepatitis C. (Tr. 38).

Plaintiff also has bipolar disorder, anxiety, and depression. (Tr. 32-33). Plaintiff had last seen someone for these conditions about a year before the hearing and had been refilling her medicine since; she was planning to go back soon. (Tr. 36). Her medication helps. (Tr. 37-38).

### B. MEDICAL AND OTHER RECORDS

Treatment notes from 1981 and 1982 indicate that Plaintiff had seizures when she was a baby. (Tr. 264-66). An EEG performed in April 1981 was normal. (Tr. 265). A March 1982 record states that her last seizure was in March 1981. (Tr. 264).

From October 2007 through May 2008, Plaintiff was treated by David Dale, D.O. (Tr. 193-202). Throughout this time period, Plaintiff regularly complained of pain in her legs and back. (Tr. 193-98). Dr. Dale diagnosed fibromyalgia, herniated disc, intractable pain, and hypothyroidism (Graves Disease). He prescribed numerous medications, including Oxycontin, Lorcet, Soma, and a Duragesic patch. (Tr. 193-202). In March 2008, a musculoskeletal examination showed numbness, muscle weakness, decreased strength, and decreased range of motion. (Tr. 200). However, in April 2008, musculoskeletal examination was normal. (Tr. 201). Also in April 2008, Dr. Dale ordered a substance-abuse panel, which revealed several positive results, including for barbiturates and marijuana. (Tr. 189, 201). In May 2008, Dr. Dale diagnosed addiction and intractable pain and recommended that Plaintiff go straight to detox and then rehab. (Tr. 202).

From October 2008 through January 2009, Plaintiff was treated by Tammy Albrecht, M.D. (Tr. 203-209). On October 10, 2008, Plaintiff stated that she had a herniated disc and that she had trouble sleeping at night and mostly lies on the couch all the time because of the pain. (Tr. 208). She also reported feeling depressed most of the time. Dr. Albrecht assessed degenerative disc disease, lumbar; hypertension; and anxiety syndrome. Dr. Albrecht strongly recommended a routine exercise plan of walking at least 30-40 minutes a day, stating that it would help with both her depression and chronic back pain. She prescribed low-dose Kadian with Vicodin for breakthrough pain. (Tr. 208). On October 22, 2008, Plaintiff returned and reported feeling much better overall. She reported that her mood was better on Celexa and that her pain was much better controlled. (Tr. 207). On November 7, 2008, Plaintiff reported that she was having pain in her hips, that her mood was doing much better with the Cymbalta and Celexa, and that she had increased stamina. Dr. Albrecht noted that she had talked with Plaintiff regarding narcotic resistance and stated that she would not increase Plaintiff's narcotic dosing. (Tr. 206). On November 24, 2008, Plaintiff reported some burning sensation in the right hip. (Tr. 205). On December 24, 2008, Plaintiff reported that her baseline pain was around 2-3 and that she needed more Celexa because she was starting to feel more down; Dr. Albrecht increased her Celexa. (Tr. 204). On January 22, 2009, Plaintiff reported that her pain was doing ok but that she was starting to get intermittent pain into her right lower back and buttocks. Plaintiff again reported that the Celexa was really helping with her mood. (Tr. 203).

From August 2008 through February 2009, Plaintiff received treatment from Phyla Opinaldo, M.D., who diagnosed benign essential hypertension, generalized osteoarthritis, hepatitis C, backache, muscle spasm, hyperlipoproteinemia, lumbago, anxiety disorder, and generalized recurrent major depression. (Tr. 210-34). On August 13, 2008, Plaintiff reported

back pain and stress and requested to be restarted on her pain medications. (Tr. 223). On examination, Plaintiff had tenderness and spasms in her lumbosacral and thoracic spine. (Tr. 224). Dr. Opinaldo prescribed medications including Vicodin, Cymbalta, and hydrochlorothiazide, and she noted that Plaintiff's goal was to maintain regular exercise. (Tr. 225).

On September 5, 2008, X-rays of the lumbar and thoracic spine showed no abnormalities. (Tr. 229). On September 10, 2008, Plaintiff reported low back pain, not helped by current medications; anxiety; and headaches. (Tr. 221). On examination, she had spasms and tenderness in the lumbar and thoracic spine, but a straight-leg raising test was normal and a motor exam demonstrated no dysfunction. (Tr. 222). Dr. Opinaldo again noted that Plaintiff's goal was to maintain regular exercise, and she prescribed Soma and Lortab. (Tr. 223). On September 24, 2008, Plaintiff reported hurting all over and said that Vicodin was not working for her pain; she also reported feeling tired or poorly, having muscle aches, and having anxiety and depression. Plaintiff had tenderness and spasms in her thoracic and lumbar spine. (Tr. 220). Dr. Opinaldo also diagnosed hepatitis C. (Tr. 219). However, a hepatobiliary ultrasound performed October 3, 2008, showed no abnormalities in the liver, kidney, or gallbladder. (Tr. 226). A lumbar spine MRI performed October 3, 2008, showed left paracentral disc protrusion. (Tr. 227). A thoracic spine MRI from the dasme date showed degenerative disc narrowing at T7-8 with herniation, and right posterior disc protrusion at T9-10. (Tr. 228). On November 4, 2008, Plaintiff stated that she had had increased pain over the weekend and was feeling tired or poorly. (Tr. 217). Dr. Opinaldo noted that she had "obvious discomfort with positional changes and with ambulation/noted change in gate [sic] with favoring of the left side." (Tr. 217-18). On

December 3, 2008, Plaintiff reported that her current prescriptions were helping her. (Tr. 214). Dr. Opinaldo noted some stiffness with range of motion and position changes. (Tr. 216).

On January 5, 2009, Plaintiff reported anxiety and wanted referral to pain management. (Tr. 212). On examination, she had tenderness and muscle spasms in her lumbar spine, but a straight-leg raising test was negative. A motor exam demonstrated no dysfunction, and her gait and stance were normal. It was again noted that Plaintiff's goal was "to maintain regular exercise." (Tr. 213). On February 3, 2009, Plaintiff reported mid and low back pain but reported that she was not feeling tired or poorly. (Tr. 210). On examination, her middle and lower back exhibited tenderness. Dr. Opinaldo indicated that she would not refill any more controlled substances because she had found out that Plaintiff had been obtaining controlled substances from two doctors at the same time. (Tr. 211).

On April 2, 2009, Plaintiff saw Dr. Brian Green to establish care. She reported that her back pain was a result of two previous motor vehicle accidents at ages 18 and 23 (in 2000 and 2005). She described pain in her lower back without significant radiation, numbness, or paresthesias of the lower extremities. She asked to switch from Kadian to methadone for control of her pain, but Dr. Green declined. (Tr. 298). He refilled her Cymbalta, Celexa, Kadian, hydrocodone/APAP, Xanax, propranolol, and HCTZ, but then explained that he would not continue to prescribe her narcotic medications; he recommended that she return to her primary care physician or seek care from another physician. (Tr. 299). On May 8, 2009, Plaintiff returned to Dr. Green for a medication refill, stating that she was not going back to her previous physician, who had been mean to her. Plaintiff stated that she did well with Kadian except that it caused some itching at times. Dr. Green diagnosed chronic back pain and narcotic dependence. He refilled her medications on the condition that they would try to titrate her off. (Tr. 305). On

June 1, 2009, Plaintiff returned for medication refills and reported that her back pain had been fairly well-controlled. Dr. Green diagnosed degenerative disc disease of the lumbar spine and narcotic dependence. (Tr. 312). On June 23, 2009, Plaintiff returned for medication refills and reported that her pain medications were working fairly well, with no side effects. Dr. Green noted that ambulation was normal. He diagnosed chronic back pain, dependent upon narcotic pain control. (Tr. 318).

In July 2009, an emergency room record indicated that Plaintiff had low back pain and should follow up with a Dr. Thompson. (Tr. 272).

In a questionnaire dated July 22, 2009, Plaintiff reported that she had a history of seizures, blood clotting disease, COPD, severe back problems, and Graves disease. She stated that her mother helped her with showers and baths and that she had a fear of falling and dizziness due to her seizures. (Tr. 329). She reported that her mother assisted her with grooming, meal preparation, and shopping. She reported that she needed a "human assist" when getting up from a sitting position and going up and down stairs. (Tr. 330).

In a Function Report dated September 7, 2009, Plaintiff stated that she got up at 6:00 a.m. each day, got her children ready and took them to school, then came home and lay down and watched television until 3:30 p.m. (Tr. 147). She stated that she prepared meals, did laundry and dishes, drove a car, shopped for groceries and household items, and had no problems with personal care. (Tr. 149-50). She reported that she spent time with others, talked on the phone, and visited when people come over. (Tr. 151). She stated that she could lift no more than ten pounds, could not squat or bend due to back pain, could stand or walk for only thirty minutes at a time, and found it impossible to kneel. She stated that she could only pay attention "for short periods of time." Plaintiff did not report any difficulties sitting, stair climbing, completing tasks,

concentration, or getting along with others. (Tr. 152). She stated that she could not handle much stress and did not like being out in public alone. (Tr. 153).

On November 9, 2009, non-examining, record reviewing, state agency physician, Geoffrey Sutton, Ph.D., determined that Plaintiff had anxiety and depression but that she had no functional limitations related to those impairments and that they were not severe. (Tr. 257, 259).

On February 22, 2010, it was noted that Plaintiff's doctor had recommended methadone for back pain. (Tr. 326).

On January 5, 2011, a lumbar MRI ordered revealed (1) small left paracentral disc protrusion at the L5-S1 level resulting in mild-to-moderate left lateral recess stenosis without central canal or neural foraminal stenosis, unchanged from prior exam; and (2) interval development of slight disc bulge through L4-L5 level which does not result in significant central canal, neural foraminal or lateral recess stenosis; (3) disc dessication on L5-S1 consistent with degenerative disc disease; and (4) otherwise, unremarkable MRI of the lumbar spine. (Tr. 276-77).

In January and February 2011, Plaintiff was treated at Shannon County Medical Clinic. (Tr. 332-36).[2] On January 26, 2011, a musculoskeletal examination was normal, with no abnormalities noted in gait, station, or range of motion. (Tr. 336). On February 11, 2011, it was noted that Plaintiff had constant back pain with a severity of 5/10 and had muscle spasms. Her musculoskeletal examination was normal, with no abnormalities noted in gait, station, or range of motion. (Tr. 333-34). She denied symptoms of anxiety or depression. (Tr. 333).

On March 24, 2011, Plaintiff saw Jennifer Long, Psy.D. for a clinical assessment. (Tr. 278, 342-45). Plaintiff told Dr. Long that she had been feeling depressed and fatigued lately,

---

[2] It appears that various diagnoses and recommendations were made; however, these statements are illegible.

with no motivation.  She stated that she had "mostly remained stable on medications and [did] not need therapy when managed on medication."  (Tr. 342).  She reported having no pain. Plaintiff denied previous dependence on pain medication, but Dr. Long noted that in a previous assessment she had indicated that she was dependent on pain medicine and pot.  (Tr. 343). Plaintiff said her primary goal for treatment was "[t]o get meds."  (Tr. 345).  Dr. Long stated that Plaintiff was fully able to care for herself.  Plaintiff was cooperative, with normal speech, appropriate behavior, a goal-directed thought process, intact judgment/insight, good attention/concentration (90% on task), and no hallucinations or delusions.  (Tr. 344).  However, her mood was anxious.  Dr. Long diagnosed bipolar disorder and stated, "symptoms are causing clinically significant distress and impairment in functioning."  (Tr. 344-45).  Dr. Long diagnosed bipolar disorder, cannabis abuse, and opioid dependency, and she gave Plaintiff a Global Assessment of Functioning (GAF) score of 55.  (Tr. 344).[3]

On March 29, 2011, Plaintiff was evaluated again regarding her psychological conditions by Henry Kalir, M.D., Ph.D.  Plaintiff told Dr. Kalir she had experienced severe mood swings since age eighteen and was subject to racing thoughts, spending sprees, and alternating grandiosity and depression.  She denied any history of drug abuse.  (Tr. 346).  Her affect was somewhat anxious but her mental status examination was otherwise normal.  (Tr. 348-49).  Dr. Kalir stated, "This is a patient with symptoms consistent with a bipolar affective disorder who has not been treated with mood stabilizers and would likely benefit from mood stabilizer use."

_____

[3] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV*), 32 (4th ed. 1994).  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV* 32.

He prescribed Xanax, Topamax, Lamictal, Abilify, and Cymbalta, and he discontinued Celexa. Dr. Kalir diagnosed bipolar affective disorder and personality disorder and assigned a GAF score of 55. (Tr. 348).

## C. VOCATIONAL EVIDENCE

Vocational Expert (VE) Janice Aster testified at the hearing before the ALJ. The VE posed the following hypothetical:

> [A]ssume we have an individual of the same age, educational background, as the claimant and work history. For this first hypothetical assume she would be [INAUDIBLE] to occasional ten minutes, frequently ten minutes.[4] She can stand for no more than two hours out of an eight hour day. She can occasionally climb, stoop, crouch, kneel. She should avoid prolonged exposure to vibrations.

The VE stated that such an individual could perform "a wide range of unskilled sedentary jobs." (Tr. 40). She gave examples of charge counselor, DOT code 205.367-014, eyeglass frame polisher, DOT code 713.684-038, and semi-conductor loader, DOT code 726.687-030. The VE testified that those jobs would still be available to an individual who could never climb ropes, scaffolds, or ladders and should avoid unprotected heights and hazardous moving machinery. (Tr. 41). The VE testified that if the individual were limited to jobs "that would [INAUDIBLE] details with complicated [INAUDIBLE] would not require close cooperation or interaction with co-workers [INAUDIBLE]"[5] and "would require only occasional cooperation and interaction with the general public," the charge account clerk job would not be available but the other two jobs would be. (Tr. 41-42).

---

[4] Plaintiff indicates that the hypothetical limited the claimant to lifting or carrying up to ten pounds frequently or occasionally, and the undersigned assumes this is correct. (Pl's. Br., Doc. 11, at p. 4).

[5] Plaintiff indicates that the hypothetical limited the claimant to "no attention to detail when performing tasks," and the undersigned assumes that this is correct. (Pl's. Br., Doc. 11, at p. 13).

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii). If the claimant

has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.  DECISION OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 12). He found that she had the following severe impairments: fibromyalgia, degenerative disc disease, a seizure disorder, a substance addiction disorder, and bipolar disorder (also diagnosed as depression). (Tr. 12). However, he found that she did not

have an impairment or combination of impairments that met or equaled an impairment listed in

20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13).

The ALJ found that Plaintiff had the residual functional capacity to:

> perform sedentary work as defined in 20 CFR 416.967(a) except for the following exertional limitations: she can lift or carry up to ten pounds occasionally and ten pounds frequently; stand or walk for two hours out of an eight hour work day; and sit for about six hours during an eight hour work day. She can occasionally climb stairs but never climb ropes, ladders or scaffolds.  She can frequently balance and occasionally stoop, crouch, kneel, or crawl.  The claimant also has nonexertional limitations in that she must avoid unprotected heights, hazardous moving machinery, and vibrations.  Additionally, the claimant is limited to jobs that would not demand attention to details or complicated instructions or job tasks and that would require only occasional interaction and cooperation with the general public.  She may work in proximity to others but would be limited to jobs that do not require close interaction and cooperation with co-workers, in that she would work best in relative isolation.

(Tr. 15).  The ALJ found that Plaintiff had no past relevant work.  (Tr. 19).  However, relying on

the testimony of the VE, he found that there were other jobs available in the national economy

that she could perform.  Thus, he found that she had not been under a disability since the date of

her application.  (Tr. 20).

## V.     DISCUSSION

### A. Standard For Judicial Review

The court's role in reviewing the Commissioner's decision is to determine whether the

decision "'complies with the relevant legal requirements and is supported by substantial evidence

in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting

*Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence 'is less than a

preponderance, but enough that a reasonable mind might accept as adequate to support a

conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v.

Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence

supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B. Whether the RFC was Supported by Substantial Evidence

Plaintiff's first argument is that the ALJ erred in determining Plaintiff's RFC. A claimant's RFC is "the most a claimant can do despite her limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Here, the ALJ found that Plaintiff was restricted to sedentary work as defined in 20 C.F.R. § 416.967(a), with the following additional limitations: (1) she can lift or carry up to ten pounds occasionally and frequently; (2) she can stand or walk for two hours out of an eight hour work day; (3) she can sit for about six hours during an eight hour work day; (4) she can occasionally climb stairs but never climb ropes, ladders, or scaffolds; (5) she can frequently balance and occasionally stoop, crouch, kneel, or crawl; (6) she must avoid unprotected heights,

hazardous moving machinery, and vibrations; (7) she is limited to jobs that would not demand attention to details or complicated instructions or job tasks and that would require only occasional interaction and cooperation with the general public; (8) she may work in proximity to others but would be limited to jobs that do not require close interaction and cooperation with co-workers, in that she would work best in relative isolation.  (Tr. 15).

Plaintiff contends that in making this RFC finding, the ALJ made several errors: (1) he improperly evaluated Plaintiff's credibility, (2) he relied on no medical evidence, (3) he failed to develop the record adequately, and (4) he failed to consider the impact of Plaintiff's obesity on her ability to work.  The undersigned addresses each of these arguments in turn below.

### 1. THE CREDIBILITY DETERMINATION

Plaintiff disputes the ALJ's finding that Plaintiff's statements about her symptoms were not entirely credible.  When evaluating the credibility of a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  *Moore*, 572 F.3d at 524 (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'"  *Id.* at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).  However, the ALJ need not explicitly discuss each factor.  *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).  It is sufficient if the ALJ "'acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Id.*  The ALJ may not discount

allegations of disabling pain solely because they are not fully supported by the medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

The undersigned first notes that the ALJ did give credit to many of Plaintiff's subjective complaints by limiting her to sedentary work with additional physical and mental limitations. A limitation to sedentary work is "in itself a significant limitation." *Id.* at 994. In addition, the ALJ's finding that Plaintiff could lift only up to ten pounds is consistent with her statement that she could lift no more than ten pounds; his restriction of her to sedentary work is generally consistent with her statements in her Function Report that she could stand or walk for thirty minutes at a time but that she had no problems sitting; and his finding that she could climb stairs occasionally was consistent with her testimony that she had no trouble going up the stairs to her home unless they were very slick. (Tr. 15, 31, 152). Moreover, the ALJ's restriction on Plaintiff's ability to interact with coworkers is even more restrictive than her own statement in her Function Report that she did not have difficulty getting along with others. (Tr. 152).

To the extent that the ALJ did discredit Plaintiff's subjective complaints, he properly considered several of the relevant credibility factors. First, he considered the fact that her accounts of her daily activities—which involved getting up at 6:00 a.m., getting her five children ready for school, transporting them to school, doing the laundry and dishes, making meals, and having no problems with her own personal care—were inconsistent with her claims of disabling functional impairments. (Tr. 18-19, 147-53). While a claimant "need not prove she is bedridden or completely helpless to be found disabled," *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005)(internal quotation marks omitted), Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in

judging the credibility of her complaints.  *See Wagner v. Astrue*, 499 F.3d 842, 852-53 (8th Cir. 2007) (finding a claimant's accounts of "extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends" supported the ALJ's conclusion that his complaints were not fully credible); *Roberson v. Astrue*,  481 F.3d 1020, 1025 (8th Cir. 2007) (finding that in assessing a claimant's credibility, the ALJ properly considered the fact that the claimant took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals, did housework, shopped for groceries, and had no difficulty handling money); *Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.").

The ALJ also properly analyzed Plaintiff's somewhat sporadic work history, noting that it suggested a lack of motivation to work.  (Tr. 18).  Plaintiff has had no earnings at all since 2003, several years before her alleged disability onset date.  (Tr. 119).  "A lack of work history may indicate a lack of motivation to work rather than a lack of ability."  *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993)).  The ALJ also properly noted that Plaintiff's work record failed to establish that Plaintiff left the work force solely due to her impairments.  (Tr. 18).  *See Goff*, 421 F.3d at 793 ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition.").

The ALJ also properly noted that Plaintiff's inconsistent statements regarding her daily activities and her drug use undermined her credibility.  (Tr. 18).  For example, in March 2011, Plaintiff denied previous dependence on pain medication to Dr. Long, but Plaintiff had previously reported dependence on her pain medication and had been previously diagnosed with narcotic dependency.  (Tr. 305, 312, 343).  She also "adamantly denied" current substance abuse

to Dr. Long, but the previous week she had testified at the hearing before the ALJ that she had ongoing narcotic dependence. (Tr. 18, 31, 343). In addition, the ALJ noted that on a questionnaire dated July 22, 2009, Plaintiff reported that she needed assistance with grooming, bathing, meal preparation, shopping, and going up and down stairs. (Tr. 18, 330). However in a Function Report dated just two and a half months later, she reported that she performed these activities without help and had no problems with personal care. (Tr. 149-52). These inconsistencies weigh against Plaintiff's credibility. *See Raney v. Barnhart*, 396 F.3d 1007, 1011 (8th Cir. 2005) (finding it proper for ALJ to consider "inconsistent statements to medical professionals" in assessing credibility); *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) (finding it proper for ALJ to consider "inherent inconsistencies or other circumstances"); *Simmons v. Massanari*, 264 F.3d 751, 756 (8th Cir. 2001) (considering the plaintiff's history of conflicting statements as a factor weighing against his credibility); *Ply v. Massanari,* 251 F.3d 777, 779 (8th Cir. 2001) (noting that inconsistencies in the claimant's statements about his daily activities were a factor for the ALJ to consider in assessing the plaintiff's credibility).

The ALJ also properly considered evidence that Plaintiff's mental and physical impairments were responsive to medication. (Tr. 17-18). For example, Plaintiff reported in October 2008 that her pain was much better controlled (Tr. 207), in May 2009 that she did well with Kadian despite some itching at times (Tr. 305), and in June 2009 that her pain had been fairly well controlled and that her pain medications were working fairly well with no side effects (Tr. 312, 318). Plaintiff also reported in 2008 that Cymbalta and Celexa were really helping with her mood (Tr. 203, 206), and she told Dr. Long in a 2011 psychological evaluation that she "mostly remained stable on medications and [did] not need therapy when managed on medication" (Tr. 342). "'If an impairment can be controlled by treatment or medication, it

cannot be considered disabling.'" *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)). *See also Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability.").

The ALJ also properly considered the fact that Plaintiff had not sought ongoing treatment from a psychiatrist, psychologist, or counselor. (Tr. 18). *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability."); *Vanlue v. Astrue*, No. 4:11CV595 TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and had never required more aggressive forms of mental health treatment).

Finally, the ALJ properly considered the medical evidence, including the lack of objective medical evidence in the record to support Plaintiff's complaints. *See Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) ("Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."). For example, the ALJ properly noted that Plaintiff's liver ultrasound was normal; that Plaintiff's allegations of seizures were not supported by any EEGs, MRIs, emergency room visit records, or other documentation; and that several of Plaintiff's musculoskeletal examinations had been normal or negative. (Tr. 16-18). He also noted that the medical treatment notes did not document significant abnormalities or deficits in Plaintiff's mood, affect, thought processes, concentration, attention, pace, persistence, or social interaction. (Tr. 18). *See*

*Goff*, 421 F.3d at 792*)* (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).

Plaintiff suggests that the ALJ improperly discounted the credibility of her complaints regarding hepatitis and rheumatic fever because he erroneously stated that Plaintiff "does not allege functional limitations from" those limitations. (Tr. 12). Although it appears that the ALJ's statement was erroneous, the undersigned finds the misstatement was harmless.[6] As the ALJ noted, the record does not indicate that Plaintiff had required significant medical treatment for those disorders,[7] nor does it indicate that she consistently reported these symptoms to her doctors. (Tr. 12). In addition, the same evidence the ALJ relied on to discredit Plaintiff's other claims of disabling limitations, discussed above, also discredits these statements. Moreover, it is clear that the ALJ considered evidence related to Plaintiff's hepatitis even after making this statement. For example, he discussed it in his step two analysis, and he discussed her normal hepatobiliary ultrasound and the absence of evidence of chronic liver disease or other symptoms in his RFC analysis. (Tr. 13, 16).

The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)). Here, the ALJ provided good reasons for his credibility determination, and the undersigned will defer to it.

---

[6] When asked at the hearing how hepatitis C affected her physically, Plaintiff stated, "I think that mostly now it's just making me feel bad most of the time, you know, real run down and lethargic. I don't know, just knowing that you have it." (Tr. 37). When asked about her rheumatic fever, Plaintiff reported that it causes pain and swelling when she has a fever, which happens often because of the hepatitis. (Tr. 38).

[7] Plaintiff suggested at the hearing that she was not yet receiving treatment for her hepatitis because it had "just recently been diagnosed"; in fact, the record shows that it had been diagnosed about two and a half years earlier. (Tr. 37, 219-20).

## 2. MEDICAL EVIDENCE SUPPORTING THE RFC DETERMINATION

Plaintiff also argues that the ALJ formulated Plaintiff's RFC without any medical evidence to support it and failed to explain what objective findings or other medical evidence he relied on to formulate the RFC. The undersigned disagrees.

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Thus, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Id.* at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

With respect to Plaintiff's mental RFC, the ALJ noted that he had considered the report of consultative examiner Dr. Long, who indicated that Plaintiff's mental status examination was normal aside from an anxious mood. (Tr. 18, 344). The ALJ also properly considered treatment notes suggesting that Plaintiff's medications were helping her mood. (Tr. 18, 203, 207, 214). In addition, Plaintiff's GAF score of 55, which indicates "moderate" symptoms or "moderate" difficulty in functioning, is consistent with the ALJ's determination that Plaintiff would be limited to jobs requiring only occasional interaction and cooperation with the general public and that do not require close interaction and cooperation with coworkers or attention to details or complicated instructions or tasks. (Tr. 16, 344, 348).

With respect to Plaintiff's physical RFC, the ALJ cited several mild or normal examination and diagnostic findings from Plaintiff's treating sources that supported his conclusion that she could perform sedentary work with some additional restrictions. (Tr. 16-17). For example, a 2008 motor examination showed no dysfunction; straight-leg raising tests from

2008 and 2009 were negative; Plaintiff's treating physician noted in 2009 that her ambulation was normal; and musculoskeletal examinations from 2011 showed no abnormalities in gait, station, or range of motion. (Tr. 16, 213, 222, 318, 333-34, 336). X-rays of the lumbar and thoracic spine in 2008 showed no abnormalities. (Tr. 229). Although Plaintiff's 2011 lumbar MRI showed abnormalities, they were mostly described as "slight," "small," or "mild-to-moderate." (Tr. 16, 276-77). In addition, the only EEG in the record was normal, and a hepatobiliary ultrasound performed after Plaintiff was diagnosed with hepatitis C showed no abnormalities. (Tr. 16, 226, 265).

Objective findings similar to these have previously been held sufficient to constitute "medical evidence" in support of a finding that a claimant can perform even light or medium work, at least where other evidence in the record is consistent with the ALJ's conclusions. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (upholding the ALJ's finding that the plaintiff could perform light work based on largely mild or normal objective findings regarding her back condition, despite the fact that the medical evidence was "'silent' with regard to work-related restrictions such as the length of time she [could] sit, stand, and walk and the amount of weight she can carry"); *Flynn v. Astrue*, 513 F.3d 788, 789 (8th Cir. 2008) (finding that physicians' observations that the claimant had normal muscle strength and mobility constituted medical evidence supporting the ALJ's conclusion that the claimant could lift 20 pounds occasionally and 10 pounds frequently); *Thornhill v. Colvin*, No. 4:12-CV-1150 (CEJ), 2013 WL 3835830, at *12 (E.D. Mo. July 24, 2013) (finding that medical records supporting the ALJ's statement that "physical examinations have been essentially unremarkable and reveal normal independent gait with no evidence of spine or joint abnormality or range of motion limitation or muscle tenderness" constituted medical evidence in support of a finding that the claimant could perform

medium work). Here, similarly, the largely mild-to-moderate or normal objective medical findings provide some medical evidence in support of the ALJ's conclusion that Plaintiff could perform sedentary work with some additional restrictions, particularly when considered in combination with the ALJ's credibility analysis and the record as a whole.

The undersigned further notes that Plaintiff's physicians repeatedly recommended that Plaintiff exercise, including one recommendation that she walk at least 30 to 40 minutes a day. (Tr. 208, 213, 223). The Eighth Circuit has held that "[i]n the absence of other evidence in the record, a physician's unrestricted recommendations to increase physical exercise are inconsistent with a claim of physical limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); *see also Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) ("A lack of functional restrictions on the claimant's activities is inconsistent with a disability claim where, as here, the claimant's treating physicians are recommending increased physical exercise.").

In sum, the undersigned finds that the RFC is supported by "some medical evidence."

### 3.    CONSIDERATION OF PLAINTIFF'S OBESITY

Plaintiff next argues that the ALJ failed to adequately evaluate and explain the impact of Plaintiff's obesity, as required by Social Security Ruling ("SSR") 02-01p. The undersigned finds no error.

The Social Security Administration recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q). *See also* SSR 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002) (discussing how individuals with obesity are at a greater than average risk of developing numerous other impairments). Thus, at all stages of the

sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. 404, Subpt. P, App'x 1, § 1.00(Q).

Here, Plaintiff's assertion that the ALJ did not evaluate the impact of Plaintiff's obesity on her impairments is simply not supported by an examination of the ALJ's decision. The ALJ expressly acknowledged Plaintiff's diagnosis of obesity and her body mass index of 33,[8] specifically cited SSR 02-01p, noted that the combined effects of obesity with other impairments could be greater than the effects of each impairment considered separately, and stated that he had considered the effects of Plaintiff's obesity in determining her RFC. (Tr. 17). This discussion is sufficient to show that the ALJ adequately complied with SSR 02-01 p and considered the effects of Plaintiff's obesity on her RFC. *See Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1153 (8th Cir. 2004) (finding that an ALJ adequately considered obesity when he "specifically referred to [the claimant's] obesity in evaluating his claim"); *Heino v. Astrue*, 578 F.3d 873, 881-82 (8th Cir. 2009) (holding that the ALJ adequately took into account a claimant's obesity where the ALJ "made numerous references on the record" to claimant's obesity, noted her weight and height, and included "has a history of obesity" in the hypothetical to the VE). The undersigned further notes that Plaintiff does not explain how the RFC, which limited Plaintiff to sedentary work with several additional exertional limitations, failed to account for any possible additional effects of her obesity.

### 4.    DUTY TO DEVELOP THE RECORD

Plaintiff next argues that the record did not contain sufficient information for the ALJ to determine Plaintiff's ability to function and that the ALJ therefore failed to develop the record.

---

[8] A Body Mass Index of 30.0 or above indicates obesity. *See* SSR 02-01p, 2002 WL 34686281, at *2.

It is well settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). That duty is heightened where, as here, the claimant is not represented by counsel. *See Reeder v. Apfel*, 214 F.3d 984, 987 (8th Cir. 2000). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Nader v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). However, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id.*; *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001). "There is no bright line indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). Reversal due to failure to develop the record is only warranted when such failure is unfair or prejudicial. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

The undersigned finds that the record in this case contained a sufficient basis for the ALJ to determine that Plaintiff could perform sedentary work with additional restrictions, such that additional development of the record was not required. The record contained documentation of Plaintiff's visits to her treating physicians over the 2007-2011 time period, along with her physicians' observations and examination findings; records of X-rays, MRIs, and ultrasounds relevant to her impairments; the reports of two psychological consultative examiners; a Function Report and questionnaire regarding Plaintiff's daily activities; and Plaintiff's testimony regarding the effects of her impairments. As discussed above, the ALJ properly considered all of this evidence and assessed it in light of the relevant credibility factors in determining that Plaintiff could perform sedentary work with some additional limitations. It does not appear that any

crucial issue was undeveloped, nor does it appear that Plaintiff was prejudiced by the absence of additional evidence. Thus, the undersigned finds remand is not required for further development of the record. *See Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (finding that the ALJ was not required to recontact the claimant's treating physicians or obtain a consultative examination where no "crucial issue" in the record required development); *Halverson v. Astrue*, 600 F.3d 922, 933-34 (8th Cir. 2010) (rejecting the plaintiff's claim that the ALJ should have ordered a consultative examination regarding her ability to function after he discredited her treating doctor's opinion; reasoning that the plaintiff's medical records, statements, and other evidence were sufficient to support the ALJ's decision).

In sum, for the above reasons, the undersigned finds that the ALJ's RFC determination was supported by substantial evidence and that none of the issues identified by the Plaintiff warrant remand.

## C. WHETHER THE VOCATIONAL EXPERT'S TESTIMONY WAS INCONSISTENT WITH THE *DICTIONARY OF OCCUPATIONAL TITLES*

Plaintiff next argues that in determining that she can perform other work existing in significant numbers in the national economy, the ALJ erred by relying on the testimony of the vocational expert (VE) because the VE's testimony was inconsistent with information contained in the *Dictionary of Occupational Titles* (*DOT*). The ALJ may rely on the testimony of a vocational expert to establish that the claimant can perform other work existing in significant numbers. *See Cox v. Astrue*, 495 F.3d 614, 620-21 (8th Cir. 2007). However, "an ALJ cannot rely on expert testimony that conflicts with the job classifications in the [*Dictionary of Occupational Titles*] unless there is evidence in the record to rebut those classifications." *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003).

Here, the ALJ asked the VE to consider an individual who, among other things, could only lift or carry up to 10 pounds occasionally or frequently, could use no attention to detail when performing tasks, and could not perform a job involving hazardous moving machinery. (Tr. 40-41). The VE testified that such a person could perform the jobs of eyeglass frame polisher, *DOT* code 713.684-038, and semiconductor loader, *DOT* code 726.687-030.

The *DOT* entry for eyeglass frame polisher, *DOT* code 713.684-038, reads as follows:

Polishes plastic eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Applies abrasive compound to wheel surface, using brush. Starts machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspects and feels polished parts to verify removal of flaws. Presses sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence.

The *DOT* entry for Loader, Semiconductor Dies, *DOT* code 726.687-030, reads as follows:

Loads dies, using vacuum wand, into carriers that hold and protect dies during fabrication of semiconductor packages: Pours dies from container onto filter paper. Picks up and places dies circuit-side up in indentations in carrier, using vacuum wand. Secures lid on carrier, using manual pressure. May clean dies prior to loading, using solutions and cleaning equipment. May sort semiconductor devices to remove defective devices marked in inspection department.

Plaintiff argues that these jobs are inconsistent with the limitations identified by the ALJ in three ways: (1) the jobs are sedentary and thus require the lifting/carrying of a "negligible amount of weight frequently," which Plaintiff argues conflicts with the ALJ's limitation in the hypothetical of lifting 10 pounds frequently; (2) the first job requires the operation of a polishing wheel, in conflict with the ALJ's limitation on jobs involving hazardous machinery; and (3) the jobs requires attention to detail, which conflicts with the ALJ's hypothetical.

These arguments are without merit. First, a hypothetical individual who could lift up to ten pounds frequently could certainly also lift a negligible amount of weight frequently, as Plaintiff claims is required to perform these sedentary jobs. Second, although the polishing wheel is a machine, there is nothing in the *DOT* description that suggests that it is "hazardous." Third, neither of these jobs specifically state that they require "attention to detail." Although both jobs have a reasoning level of two (which requires a person to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," *DOT*, Appendix C), that reasoning level does not necessarily create a conflict with a limitation on a claimant's ability to pay attention to detail. *See Robeson v. Colvin*, No. 13-3109-CV-S-ODS-SSA, 2014 WL 353283, at *4 (W.D. Mo. Jan. 30, 2014) (finding no conflict between a VE's testimony that a claimant who "is not able to sustain a high level of concentration such as sustained precision or sustained attention to detail" could perform the job of assembler and the fact that the *DOT* assigned that job a reasoning level of two). Thus, the undersigned finds no apparent conflict between the VE's testimony and the *DOT* and no reason to question the VE's testimony that an individual with the described limitations could not do these jobs. *See Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007) (finding no apparent conflict between the Vocational Expert's testimony and the *DOT* after review of the job descriptions in question).

Moreover, substantial evidence in the record as a whole supports the ALJ's finding that Plaintiff can perform these jobs as described in the *DOT*. For example, although Plaintiff indicated in a Function Report that she could only pay attention "for short periods of time," in the same Function Report Plaintiff indicated that her conditions did not affect her ability to see, to concentrate, or to complete tasks. (Tr. 152). When the statements by Plaintiff about her

functioning are taken together with all of the other evidence of record, there is substantial evidence to support the finding that Plaintiff could perform the jobs described by the VE.

### D. WHETHER THE HYPOTHETICAL QUESTION POSED TO THE VOCATIONAL EXPERT WAS INCOMPLETE

Plaintiff's final argument is that the hypothetical question posed to the VE was incomplete or inadequate because it did not account for all of the impairments in Plaintiff's RFC.

As discussed above, at Step Five, the Commissioner bears the burden of establishing that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). "'Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007)).

Plaintiff first argues that the hypothetical posed to the VE was inadequate because it failed to include the six-hour sitting limitation in the RFC. This argument is without merit, because a claimant who can sit for six hours in a work day can sit long enough to perform the full range of sedentary work. *See* SSR 96-9 p, 1996 WL 374185, at *6 (July 2, 1996) ("In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday."). The jobs identified by the VE were both sedentary jobs.

Plaintiff also argues that the hypothetical posed to the VE was inadequate because although the RFC stated that Plaintiff should "avoid . . . vibration," the hypothetical only stated that the claimant should "avoid prolonged exposure to vibrations." (Tr. 15, 40). The undersigned first notes that it is somewhat unclear why the RFC included any limitation on

exposure to vibration, because neither Plaintiff's testimony nor the medical record appear to suggest that her impairments cause her to be unable to tolerate vibration. Regardless, the undersigned finds that the hypothetical limitation to avoiding "prolonged exposure to vibrations" adequately captures the ALJ's RFC finding that Plaintiff should avoid vibration. Because the hypothetical to the VE adequately captured the consequences of Plaintiff's impairments that were supported by the record, the response to that hypothetical question constitutes substantial evidence to support the ALJ's finding at Step Five. *See Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (finding substantial evidence supporting the ALJ's conclusion at step five where the ALJ's hypothetical posed to the VE contained all of the concrete consequences of the plaintiff's physical deficiencies).

Moreover, even if a limitation on "prolonged vibration" did not adequately capture a limitation on "vibration," Plaintiff fails to demonstrate how this alleged error prejudiced her claim. The *DOT* descriptions of the jobs above do not indicate that they involve vibration at all, and there is no reason to believe that they would be unavailable to someone who should avoid vibration but available to someone who should avoid prolonged vibration. *See DOT* code 726.687-030; *DOT* code 713.684-038; *see also* SSR 96-9p, 1996 WL 374185, at *9 ("In general, few occupations in the unskilled sedentary occupational base require work in environments with . . . vibration"). Absent any prejudice from this error, remand is not required. *See Lewis v. Astrue*, No. 10-0478-CV-W-NKL, 2011 WL 1467656, at *10 (W.D. Mo. April 16, 2011) (affirming where the ALJ failed to include limitations on exposure to heights and moving machinery in the hypothetical to the VE but the jobs identified by the ALJ did not involve heights or moving machinery; noting that the plaintiff "fails to demonstrate how such a de minimus error prejudiced her Social Security claim").

## VI.    <u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>25th</u> day of <u>February</u>, <u>2014</u>.